UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT LONDON

CIVIL ACTION NO. 12-255-DLB-HAI

EMOGENE C. HALCOMB, individually and as surviving
spouse of DAVID C. HALCOMB; and EMOGENE C. HALCOMB,
Administratrix of the Estate of David C. Halcomb                    PLAINTIFF


vs.                    MEMORANDUM OPINION AND ORDER


BRITTHAVEN, INC.                                    DEFENDANT

************************

## I.    Introduction

Defendant Britthaven, Inc. ("Britthaven") moves for partial summary judgment on Plaintiff Emogene C. Halcomb's ("Mrs. Halcomb") negligence claim, arguing that she cannot establish negligence *per se* based on violations of the Federal Nursing Home Reform Act ("FNHRA"), the Kentucky Adult Protection Act ("KAPA"), KRS Chapter 216 (governing long-term care facilities), KRS § 508.090 (criminal abuse), KRS § 530.080 (endangering an incompetent person) and KRS § 506.080 (criminal facilitation). Britthaven also contends that it is entitled to summary judgment on Mrs. Halcomb's medical negligence claim because she has failed to prove causation via expert testimony, as required by Kentucky law. Finally, Britthaven argues that summary judgment is appropriate on Mrs. Halcomb's loss of consortium claim because it is time-barred by the applicable statute of limitations. The Court has diversity jurisdiction over this matter pursuant to 32

1

U.S.C. § 1332.[1]

## II.    Factual and Procedural Background[2]

On December 7, 2010, 66 year-old David C. Halcomb ("Mr. Halcomb") suffered a serious stroke.  (Doc. # 14-1 at 4).  He was admitted to Johnson City Medical Center ("JCMC"), where he received emergency treatment for about three days.  (*Id.*).  JCMC staff then transferred Mr. Halcomb to Britthaven of Tri-Cities ("Tri-Cities facility") for long-term rehabilitative care.  (*Id.*).  In addition to his stroke, Mr. Halcomb suffered from several other medical conditions, including coronary artery disease, ischemic cardiomyopathy, Type II diabetes, neuropathy, hypertension, chronic kidney disease, hypothyroidism, osteoarthritis, obesity and "black lung."  (*Id.*).

---

1)    According to the Complaint, filed in Harlan Circuit Court on November 28, 2012, Britthaven is "a Corporation organized and existing under the laws of the Commonwealth of Kentucky with its principal place of business located at 19101 Highway 119, Cumberland, Kentucky 40823."  (Doc. # 1-5 at 2-3).  However, the Notice of Removal and Rule 7.1 disclosures (Docs. # 1 and 5) indicate that Britthaven is actually incorporated in North Carolina and has its principal place of business in North Carolina.  Mrs. Halcomb has not moved to remand the case or otherwise contested jurisdiction, but the Court will briefly address the jurisdictional question out of an abundance of caution.

Corporations are deemed to be "a citizen of any state by which it has been incorporated and of the state where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  Therefore, Britthaven is a citizen of North Carolina.  Because Mrs. Halcomb is a citizen of Kentucky (Doc. # 1-5 at 2), there is complete diversity between the parties.  The Court also believes that the amount in controversy is satisfied, given the seriousness of the allegations in this case.  Thus, diversity jurisdiction is proper.

2)    The only evidence in the record relevant to Britthaven's Motions are the reports from Dr. Gregory Compton and Nurse Cynthia Clevenger, who were retained by Britthaven and Mrs. Halcomb, respectively, to opine on the standard of care.  Although their reports contain many references to Mr. Halcomb's medical records, the documents themselves are not in the Court's record.  Without such documentation, the Court had to rely upon the experts' reports in piecing together the Factual and Procedural Background. The purpose of this section is to lay a solid foundation for the reader, not to prioritize the opinion of one expert over another. Accordingly, this section is mostly composed of undisputed facts, with all contested facts carefully designated as such.

Upon arrival at the Tri-Cities facility, Mr. Halcomb scored a 15 on his fall risk assessment form. (Doc. # 13-3 at 1). Although follow-ups were required for scores greater than 10, Mr. Halcomb's records allegedly indicated that no follow-up was necessary. (*Id.*). Three days later, Tri-Cities staff put a care plan in place that included interventions such as assisting Mr. Halcomb to negotiate barriers, placing a call bell in his reach, referring him to rehabilitation and observing for visual defects. (*Id.* at 2). Despite these interventions, Mr. Halcomb fell on December 17, 2010, prompting staff to conduct another fall risk assessment. (*Id.*). Mr. Halcomb scored a 20 on this assessment, so staff gave him non-skid socks and encouraged him to use the call bell. (*Id.*). Mr. Halcomb fell two more times the following week. (*Id.*). Nothing in the record suggests that Mr. Halcomb was seriously injured by any of these falls.

On December 14, 2010, Mr. Halcomb's lab results revealed a BUN level of 27 and a Creatinine level of 2.2.[3] (*Id.*). Mr. Halcomb began suffering from diarrhea around the same time. (*Id.*). Tri-Cities staff implemented a care plan to address Mr. Halcomb's fluid volume deficit on December 23, 2010. (*Id.*). Five days later, Dr. Gregory Dye ("Dr. Dye") decided that Mr. Halcomb's diarrhea and abnormal lab results warranted a transfer to Harlan Appalachian Regional Healthcare Hospital ("Harlan ARH"). (Doc. # 14-1 at 4).

---

3)    BUN ("blood urea nitrogen") and Creatinine levels in the blood are used to measure kidney health. See MedlinePlus: A Service of the U.S. National Library of Medicine, National Institutes of Health, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/003474.htm (last visited Feb. 25, 2015). Blood urea nitrogen is a chemical that forms when protein breaks down. *Id.* Creatinine is a chemical waste product of creatine, which supplies energy to muscles. *Id.* Both BUN and Creatinine are filtered by the kidneys and excreted in urine, so increased levels of these chemicals in the blood indicate abnormal kidney function. *Id.* Normal BUN results are 6-20 mg/dL, while normal Creatinine results are 0.7-1.3 mg/dL for men and 0.6-1.1 mg/dL for women. *Id.*

Mr. Halcomb received IV fluids upon arrival at Harlan ARH.  (*Id.*).  Although staff were unable to pinpoint the cause of Mr. Halcomb's diarrhea, they found that he was suffering from a large bladder stone and chronic systitis.  (*Id.*).  Staff recommended a transfer to JCMC so that Mr. Halcomb could see a urologist.  (*Id.*).  As staff prepared to transfer Mr. Halcomb to JCMC, his BUN levels fell from 80 to 43 and he received two units of blood for unexplained anemia.  (*Id.*).  Mr. Halcomb also received a few doses of an antibiotic known as Flagyl during his stay at Harlan ARH.  (*Id.*).

Mr. Halcomb arrived at JCMC on December 30, 2010.  (*Id.*).  He was placed under observation and given IV fluids, but JCMC staff did not recommend antibiotics.  (*Id.*).  JCMC transferred Mr. Halcomb back to the Tri-Cities facility the next day in a stable and afebrile condition.  (*Id.*).  However, Mr. Halcomb developed a fever of 100 degrees in the early hours of January 1, 2011, which staff treated with Tylenol.  (*Id.*).  His temperature peaked at 101.4 degrees later that morning.  (*Id.* at 5).  The next day, Mr. Halcomb developed another fever and staff again administered Tylenol.  (*Id.*).  Despite his fevers, he remained clinically stable.  (*Id.*).  When Mr. Halcomb's family received notice of his condition, they instructed staff not to send him to the emergency room.  (*Id.*).

On January 3, 2011, Mr. Halcomb developed yet another fever, so Dr. Dye decided to send him to Harlan ARH's emergency room.  (*Id.*).  When Mr. Halcomb arrived at Harlan ARH, he had right middle lobe pneumonia, as well as BUN levels of 80 and Creatinine levels of 4.0.  (*Id.*).  He was quickly airlifted to Central Baptist Hospital in Lexington, where he received IV fluids and antibiotics.  (*Id.*).  That same day, Mr. Halcomb suddenly went into cardiac arrest.  (*Id.*).  Attempts at cardiopulmonary resuscitation were unsuccessful.  (*Id.*).  Mr. Halcomb died of cardiac arrest on January 3, 2011.  (*Id.*).

4

Mrs. Halcomb, in both her individual capacity and as surviving spouse of Mr. Halcomb, filed this civil action in Harlan County Circuit Court on November 28, 2012. (Doc. # 1-5 at 2). Britthaven removed the action to federal court three weeks later. (Doc. # 1). After a lengthy period of discovery, Britthaven filed a Motion for Summary Judgment on Mrs. Halcomb's medical negligence claim. (Doc. # 25). Mrs. Halcomb submitted a response in timely fashion. (Doc. # 26). Britthaven filed its reply brief contemporaneously with four more Motions–a Motion for Summary Judgment on Emogene C. Halcomb's Claim for Loss of Consortium (Doc. # 27), Motion for Partial Summary Judgment on Plaintiff's Claims Alleging Violations of the Broader Provisions of KRS Chapter 216 (Doc. # 29), Motion for Partial Summary Judgment on Plaintiff's Claims Alleging Violations of Federal Statutes and Regulations (Doc. # 30) and Motion for Partial Summary Judgment on Plaintiff's Claims Alleging Criminal Conduct (Doc. # 31).

Britthaven's last four Motions apparently went unnoticed by Mrs. Halcomb's attorney, as he failed to file a response for almost two months. After receiving a courtesy call from the Court, Mrs. Halcomb's attorney hastily filed a response brief. (Doc. # 33). Although the brief is styled as a response to Britthaven's last four Motions, it substantively addresses only the Motion for Summary Judgment on Plaintiff's Claims Alleging Violations of the Broader Provisions of KRS Chapter 216. (*Id.*). Despite the perfunctory briefing on these four Motions, the Court considers them ripe for review because it has given Mrs. Halcomb more than ample opportunity to brief the issues raised therein. Accordingly, the Court will proceed with its analysis of all five Motions for Summary Judgment.

### III.     Analysis

#### a.     Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

#### b.     Negligence Per Se

To succeed on a negligence claim in Kentucky, a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the standard by which his or her duty is measured; and (3) consequent injury.  *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003).  "Generally, each person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury."  *Boland-Maloney Lumber Co., Inc. v. Burnett*, 302 S.W.3d 680, 686 (Ky. Ct. App. 2009) (internal quotations omitted).  Ordinary care is "the degree of care which a reasonably prudent person would exercise under the same or similar circumstances."  *Id.*

6

However, duty may be established in other ways. *Id.* For example, "[n]egligence *per se* 'is merely a negligence claim with a statutory standard of care substituted for the common law standard of care.'" *Young v. Carran*, 289 S.W.3d 586, 588-89 (Ky. Ct. App. 2008) (quoting *Real Estate Mktg, Inc. v. Franz*, 885 S.W.2d 921,926-27 (Ky. 1994)). The negligence *per se* doctrine has been codified by KRS § 446.070, which provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." Ky. Rev. Stat. Ann. § 446.070; *Vanhook v. Somerset Health Facilities, LP*, Civ. A. No. 14-121-GFVT, 2014 WL 7075265 at *4 (E.D. Ky. Dec. 15, 2014) (characterizing the negligence *per se* statute as "creat[ing] a private right of action under which a damaged party may sue for a violation of a statutory standard of care"). However, the plaintiff must satisfy three prerequisites:

> first, the statute in question must be penal in nature or provide "no inclusive civil remedy," *Hargis v. Baize*, 168 S.W.3d 36, 40 (Ky. 2005); second, "the party [must be] within the class of persons the statute is intended to protect," *Young*, 289 S.W.3d at 589 (citing *Hargis*, 168 S.W.3d at 40); and third, the plaintiff's injury must be of the type that the statute was designed to prevent. *Griffith v. Kuester*, 780 F. Supp. 2d 536, 547 (E.D. Ky. 2011)(quoting *Carman v. Dunaway Timber Co.*, 949 S.W.2d 569, 570 (Ky. 1997).

*Id.*

Mrs. Halcomb's Complaint includes a claim of negligence, predicated in part on Britthaven's alleged failure to exercise ordinary care under the circumstances. (Doc. # 1-5, p. 7-8, ¶ 14-15). Mrs. Halcomb further alleges that Britthaven was negligent *per se* in failing to comply with the standards of care set forth in the Federal Nursing Home Reform Act ("FNHRA"), Kentucky Adult Protection Act ("KAPA"), KRS Chapter 216, KRS § 508.090, KRS § 506.080 and KRS § 530.080. Britthaven has moved for partial summary judgment

on each of these bases for negligence *per se*.

### i.     Federal Nursing Home Reform Act ("FNHRA")

Although KRS § 446.070's "any statute" language is quite broad, Kentucky courts have limited its application to Kentucky statutes, reasoning that the General Assembly did not intend for KRS § 446.070 to "embrace the whole of federal laws and the laws of other states and thereby confer a private civil remedy for such a vast array of violations."  *T&M Jewelry v. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006).   Accordingly, courts across the Commonwealth have rejected negligence *per se* claims based on violations of federal statutes.  *See Young*, 289 S.W.3d at 589 (rejecting plaintiff's argument that KRS § 446.070 creates a state cause of action for HIPAA violations); *Vanhook*, 2014 WL 7075265 at *5 (finding that the violation of federal statutes under the Social Security Act was beyond the scope of KRS § 446.070, regardless of the substantial overlap between federal and state regulatory schemes in that context); *McCarty v. Covol Fuels No. 2, LLC*, 978 F. Supp. 2d 799 (W.D. Ky. 2013) (prohibiting the plaintiff from basing his negligence *per se* claim on MSHA violations).

Mrs. Halcomb alleges that Britthaven violated "statutory standards and requirements governing licensing and operation of long-term care facilities as set forth by . . . the applicable federal laws and regulations governing the certification of long-term care facilities under Titles XVIII or XIX of the Social Security Act."  (Doc. # 1, p. 10, ¶ 16(e)). Britthaven reasonably construes this as a negligence *per se* claim predicated on violations of the FNHRA, which is codified in Subchapters XVII and XIX of the Social Security Act. *See* 42 U.S.C. §§ 1395i-3(g), 1396.  Because the FNHRA is a federal statute, it is beyond the scope of KRS  § 446.070.  Therefore, Mrs. Halcomb's negligence *per se* claim based

8

on violations of the FNHRA must fail.

### ii.   State criminal statutes

Britthaven attacks Mrs. Halcomb's remaining bases for negligence *per se* on substantive grounds.  While the Court will give Britthaven's arguments due consideration, it must first address case law that has developed since these Motions became ripe for review.  In *Vanhook v. Somerset Health Facilities, LP*, a diversity action brought by the executor of a nursing home resident's estate against the nursing home operator alleging abuse and neglect, Judge Van Tatenhove considered, as a matter of first impression, whether the plaintiff stated negligence *per se* claims based on violations of KRS § 508.090, KRS § 506.080 and KRS § 530.080.  *See* 2014 WL 7075265 at *5.  Because several of Mrs. Halcomb's negligence *per se* claims are based on the same statutes, the Court must first ensure that these claims are viable in light of *Vanhook*.  To the extent that this inquiry disposes of Mrs. Halcomb's negligence *per se* claims, the Court will treat Britthaven's substantive arguments as moot.

Although a handful of Kentucky cases have "presum[ed] that KRS § 446.070 provides a right of action for violation of criminal statutes," the *Vanhook* court could find no case law directly applying this proposition to KRS § 508.090, KRS § 506.080 or KRS § 530.080.  2014 WL 7075265 at *6.  Without the benefit of state precedent, the court made its "'best prediction . . . of what the Kentucky Supreme Court would do if it were confronted with [the] question.'"  *Id.* (quoting *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004)).  In determining whether Kentucky law allowed the plaintiff to use KRS § 446.070 to bring suit for violations of the statutory standard of care set forth in the above-cited criminal statutes, the court applied the following three prong test to each statute: (1) whether the

9

statute is penal in nature or provides "no inclusive civil remedy;" (2) whether the party is within the class of persons the statute is intended to protect; and (3) whether the plaintiff's injury is of the type that the statute was designed to prevent.  *Id.*

The court began its analysis with KRS § 530.080, which makes it a misdemeanor to endanger the welfare of an incompetent person.  The court quickly found that the statute satisfied the first prong of the test because it "provides criminal liability for its violation, and no civil remedy is provided."  *Id.* at 7.  For the second prong, the *Vanhook* court looked to the plain language of the statute itself in determining what class of persons the statute aims to protect.  KRS § 530.080 defines an "incompetent person" as someone "who is unable to care for himself because of mental illness or intellectual disability."  *Id.*  Because the deceased nursing home resident suffered from physical infirmities only, rather than mental disabilities, the court concluded that she was not within the class of persons that the statute was intended to protect.  *Id.*  Accordingly, the court dismissed the plaintiff's negligence *per se* claim based on violations of KRS § 530.080.  *Id.*

KRS § 506.080 generally proscribes criminal facilitation.  *Id.* at 8.  Applying the three prong test to this statute, the court again found that the statute easily met the first criteria by providing for criminal liability.  *Id.* at 7.  The court then determined that the second prong was satisfied, reasoning that the statute seeks to protect the general public from collaborative criminal activity.  *Id.* at 8.  However, the court concluded that the plaintiff's injury was not of the type that the statute was designed to prevent.  While the statute aims to "promote respect for the law and discourage collaborative criminal activity," the plaintiff's complaint did not allege that such collaborative criminal activity took place.  *Id.*  Because there was no indication that the defendant "knew or was willfully blind to its employees'

criminally abusive behavior, or that it knowingly provided the opportunity or means for its employees to commit such a crime," the court dismissed the plaintiff's negligence *per se* claim based on violations of KRS § 506.080.  *Id.*

Finally, the court turned its attention to KRS § 508.090, which makes it a felony to inflict pain, injury or deprivation of services on a person who is "physically helpless" and/or "mentally helpless."  *Id.*  Because this statute also provided for criminal liability, the court found that it met the first criteria.  As for the second prong, the court again looked to the plain language of the statute itself in determining what class of persons it aims to protect. KRS § 508.090 defines "physically helpless" as "lack[ing] the substantial capacity to defend [one]self or solicit protection from law enforcement agencies."  *Id.*  According to the complaint, the decedent looked to the defendant nursing home for treatment of her total needs, thus qualifying her as "physically helpless" within the meaning of KRS § 508.090. The court further concluded that the decedent suffered from the type of harm the statute intends to prevent, namely "harmful criminal conduct directed at physically helpless and incompetent persons."  *Id.*  Because all three criteria were satisfied, the court allowed the plaintiff's negligence per se claim based on violations of KRS § 508.090 to move forward. *Id.*

Having summarized the *Vanhook* analysis in detail, the Court finds it to be equally applicable to the facts of this case.  Mrs. Halcomb based some of her negligence *per se* claims on the same criminal statutes discussed above–KRS § 508.090, KRS § 506.080 and KRS § 530.080–so the first prong of the analysis is necessarily satisfied.  While the second and third criteria are more fact-sensitive, they can be disposed of based on the similarities between Mr. Halcomb and the decedent in *Vanhook*.  Both were residents of a long-term

care facility, where they expected to receive treatment for their physical infirmities, and neither suffered from any form of mental incompetence.  Thus, to the extent that the decedent in *Vanhook* fell within the class of persons protected by the statute, so should Mr. Halcomb.  The same is true of the type of injury that the statute aims to protect, since both the *Vanhook* decedent and Mr. Halcomb allegedly received inadequate care, leading to eventual dehydration and death.  Therefore, the Court concludes that Mrs. Halcomb's negligence *per se* claims based on violations of KRS § 530.080 and KRS § 506.080 must fail, while her negligence *per se* claim predicated on violations of KRS § 508.090 may proceed.  Having streamlined Mrs. Halcomb's attempts to establish negligence *per se*, the Court will now turn to Britthaven's substantive arguments.

Britthaven argues that summary judgment is appropriate on this claim because Mrs. Halcomb "has proffered no such proof that any of Britthaven's actions rose to the level for the requisite mental state for a criminal offense under KRS § 508.090." (Doc. # 31-1 at 9).  Under KRS § 508.090, criminal abuse in the first degree requires an intentional mental state, which is present when a person's conscious objective is to cause the proscribed result or engage in the proscribed conduct.  Ky. Rev. Stat. Ann. § 501.020(1).  Criminal abuse in the second degree requires a wanton mental state, which occurs when a person is aware of and consciously disregards a substantial and unjustifiable risk that the prohibited result will occur or that the prohibited circumstance exists.  Ky. Rev. Stat. Ann. § 501.020(3).

Having reviewed the record in this case, the Court agrees with Britthaven.  Mrs. Halcomb not only neglected to respond to Britthaven's Motion, she failed to produce an indictment, deposition testimony or any other evidence of intentional or wanton conduct by

any Tri-Cities staff towards Mr. Halcomb.  In the absence of specific facts showing that there is a genuine issue of fact for trial, Britthaven is entitled to partial summary judgment on this claim.

### iii.    Kentucky Adult Protection Act ("KAPA")

In addition to the criminal statutes discussed above, the *Vanhook* court considered, as a matter of first impression, whether Kentucky's negligence *per se* statute created a private right of action for violations of KAPA.  Because the complaint was quite broad in stating a negligence *per se* claim for KAPA violations, the court had to apply its three prong test to all five categories of KAPA–the mandatory reporting requirement and administrative enforcement provisions; the section providing criminal liability for knowing, wanton or reckless abuse; the provision establishing an adult retail goods discount program; the provision establishing a senior games program; and the immunization requirement.  *Id.* at 11.  By contrast, Mrs. Halcomb's complaint specifically alleges that Britthaven was negligent *per se* in violating "KRS 209.005 et seq. and the regulations promulgated there under, by abuse, neglect and/or exploitation of David C. Halcomb."  (Doc. # 1-5, p. 9, ¶ 16(a)).  With this language in mind, the Court will limit its review of *Vanhook* to KAPA's criminal abuse provision.

KAPA "primarily aims to protect vulnerable adults from abuse, neglect, or exploitation."  Ky. Rev. Stat. Ann. § 209.010(1)(a); *Vanhook* at *11.  Applying the three prong test, the *Vanhook* court first found the criminal abuse provision was penal in nature, and while victims had standing to make a criminal complaint, it provided no direct civil remedy to the aggrieved party.  *Id.* at *13.  Because KAPA aims to protect vulnerable adults, and because the decedent was a physically infirm nursing home resident, the court

13

next concluded that the decedent fell within the class of people protected by KAPA.  *Id.*
Finally, the court found that the plaintiff had suffered the type of injury–namely, abuse and
neglect–that KAPA aims to prevent.  *Id.*  Thus, the plaintiff stated a negligence *per se* claim
predicated on violations of KAPA's criminal abuse provision.  *Id.*

Due to the similarities between Mr. Halcomb and the decedent in *Vanhook*, the Court
finds that the analysis summarized above applies with equal force to the facts of this case.
Having found that Mrs. Halcomb stated a negligence *per se* claim based on violations of
KAPA's criminal abuse provision, the Court will now consider Britthaven's substantive
arguments.

Britthaven first argues that negligence *per se* claims cannot be based on violations
of KAPA because KAPA itself does not create a private right of action.  While Britthaven
is correct in stating that KAPA does not create a private right of action, this is not fatal to
Mrs. Halcomb's claim.  After all, "[t]he negligence *per se* doctrine . . . does not depend on
a grant of a private right of action, express or implied, from the statute providing the
standard of care."  *Id.* at 6.

Next, Britthaven contends that Mrs. Halcomb cannot assert this claim because
KAPA gives the government the exclusive right to enforce and investigate adult abuse.
Again, Britthaven is correct in its statement of the law, but incorrect as to its application.
The *Vanhook* court found that KAPA's administrative provisions, which "prescribe the
procedures and obligations of governmental entities in investigating and prosecuting
reports of adult abuse," constituted an inclusive civil remedy that precluded the plaintiff from
using KRS § 446.070 to sue for violations of those provisions.  *Id.* at 12.  This reasoning
does not extend to KAPA's criminal abuse provision, which grants victims standing to make

14

a criminal complaint, but provides no direct civil remedy to the aggrieved party. *Id.*

Finally, Britthaven asserts that Mrs. Halcomb failed to prove a KAPA violation. Much like KRS § 508.090, KAPA's criminal abuse provision requires either a knowing or wanton mental state. A person acts knowingly when he is aware that his conduct is of the proscribed nature or that the proscribed circumstance exists. Ky. Rev. Stat. Ann. § 501.020(2). Wanton conduct occurs when a person is aware of and consciously disregards a substantial and unjustifiable risk that the prohibited result will occur or that the prohibited circumstance exists. Ky. Rev. Stat. Ann. § 501.020(3).

Having reviewed the record in this case, the Court must again concur with Britthaven. Mrs. Halcomb failed to respond to Britthaven's Motion. More importantly, she did not produce an indictment, deposition testimony or any other evidence of intentional or wanton conduct by any Tri-Cities staff towards Mr. Halcomb. In the absence of specific facts showing that there is a genuine issue of fact for trial, Britthaven is entitled to partial summary judgment on this claim.

### iv.    Broader Provisions of Chapter 216

The *Vanhook* court also considered, as a matter of first impression, whether KRS § 446.070 created a private right of action for violations of the general provisions of KRS Chapter 216. *Id.* at *9. As a whole, this Chapter "imposes specific licensure and public health standards on Kentucky long-term care facilities." *Vanhook*, 2014 WL 7075265 at *9; Ky. Rev. Stat. Ann. § 216.510-.600. Chief among its provisions is KRS § 216.515, which specifically "enumerates the rights of residents in long-term care facilities and defines the duties of such facilities." *Id.* This provision further clarifies that "any resident whose rights as specified in this section are deprived or infringed upon shall have a cause of action

15

against any facility responsible for the violation." Ky. Rev. Stat. Ann. § 216.515(26).

The *Vanhook* complaint broadly stated a negligence *per se* claim for "violations of the statutory standards and requirements governing licensing and operation of the long-term care facilities as set forth by the Cabinet for Health and Family Services pursuant to provisions of KRS Chapter 216....and the regulations promulgated thereunder." *Id.* at *8. The defendant, perhaps cognizant of KRS Chapter 216's overall structure, moved to dismiss "only those claims based on statutory and regulatory violations not specifically enumerated in KRS § 216.515." *Id.*

Applying its three prong test, the *Vanhook* court concluded that "[t]he specific enumeration of resident's rights and the provision of a civil remedy in KRS § 216.515 preclude a negligence *per se* action to enforce the general provisions of Chapter 216." *Id.* at *9 (citing *Pace v. Medco Franklin RE, LLC*, No. 1:12-CV-00132, 2013 WL 3233469 at *6 (W.D. Ky. June 25, 2013)). In support of this proposition, the court noted that the resident's rights provision "'evidences the legislature's intent and ability to create private rights of action for some of the provisions found in KRS Chapter 216 to the exclusion of others.'" *Id.* (citing *Pace*, 2013 WL 3233469 at *6). Accordingly, the court dismissed the plaintiff's negligence *per se* claim predicated on violations of the general provisions of KRS Chapter 216. The plaintiff's claims under KRS § 216.515(26) survived.

In alleging that Britthaven was negligent *per se* by violating KRS Chapter 216's broader provision, Mrs. Halcomb tracks the language of the *Vanhook* complaint almost verbatim. (Doc. # ). And much like the defendant in *Vanhook*, Britthaven chose to exclude claims brought pursuant to KRS § 216.515(26) from its Motion. (Doc. # 29). Given these similarities, the Court believes that a straightforward application of *Vanhook* is appropriate.

16

Mrs. Halcomb's negligence *per se* claim based on broader violations of KRS Chapter 216 fails because the statute provides an inclusive civil remedy.  This ruling is limited to Mrs. Halcomb's attempts to establish negligence *per se.*  It does not prohibit Mrs. Halcomb from pursuing her claim for violations of Kentucky's Residents Rights Act under KRS § 216.515(26).

Because Mrs. Halcomb only responded to this Motion, the Court will briefly address her efforts at statutory interpretation.  Mrs. Halcomb reads KRS § 216.515(26) as allowing her to pursue a negligence *per se* claim, in addition to a residents rights action, simply because the statute states that "[t]he remedies provided in this section are in addition to and cumulative with other legal and administrative remedies available to a resident and to the cabinet."  The Court disagrees.  This provision simply clarifies that Mrs. Halcomb need not choose between a resident's rights action and a negligence or wrongful death action.  Nothing in this clause automatically entitles Mrs. Halcomb to bring a negligence *per se* claim based on broader violations of KRS Chapter 216.  In fact, *Vanhook* holds that KRS § 216.515 precludes such a claim.  For these reasons, Britthaven is entitled to summary judgment on Mrs. Halcomb's final basis for negligence *per se.*

### c.   *Medical Negligence Claim*

While ordinary negligence claims are those in which "the common everyday experiences of the trier of the facts . . . are sufficient in order to reach the proper conclusion," medical negligence claims involve "matters of science or art requiring special knowledge or skill not ordinarily possessed by the average person."  *Thompson v. Ashland Hosp. Corp.*, (Ky. Ct. App. 2011) (quoting *Andrew v. Begley*, 203 S.W.3d 165 (Ky. Ct. App. 2006)).  Thus, medical negligence claims present a slight variation on the traditional

elements of negligence.  "Plaintiff must prove that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner, and that the negligence proximately caused injury or death."  *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982).

Under Kentucky law, causation in medical negligence cases must be proven by expert testimony.  *Perkins v. Hausladen*, 828 S.W.2d 652, 655-56 (Ky.1992).  This rule is subject to only two exceptions, both of which are incarnations of the *res ipsa loquitur* doctrine.  *Id.* at 655.  The first exception occurs when "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care."  *Id.* (internal quotations omitted).  Examples include leaving a foreign object in a human body after surgery or amputating the wrong limb.  *Id.*  The second application occurs when "medical experts may provide a sufficient foundation for *res ipsa loquitur* on more complex matters."  *Id.*  Courts are most likely to apply this exception when the defendant doctor makes admissions.  *See id.* (finding that plaintiff had established a submissible case of medical negligence without expert testimony, given the defendant doctor's testimony that "he did not drill into or tear the sigmoid sinus," compared against the husband's testimony that "the doctor told him he 'drilled in' and 'hit a blood vein'").

Mrs. Halcomb retained Nurse Cynthia Clevenger to opine on the appropriate standard of care, as well as Britthaven's alleged deviations therefrom.  (Doc. # 13-3 at 7).  Accordingly, Nurse Clevenger limited her report to those two inquiries, not once opining on causation.  (*Id.*).  She further admitted at her deposition that medical causation was beyond her area of expertise as a nurse. (Doc. # 25-4 at 4-5, 11).  Mrs. Halcomb retained no other

experts in this case, prompting Britthaven to move for summary judgment on her medical negligence claim. (Doc. # 25). Specifically, Britthaven argues that Mrs. Halcomb failed to establish causation via expert testimony, as required by Kentucky law.

In response, Mrs. Halcomb argues that expert testimony is unnecessary in this instance because the jury can reasonably infer negligence and causation from Nurse Clevenger's report. (Doc. # 26-1 at 6). This report indicates that Britthaven staff failed to properly document the nature and severity of Mr. Halcomb's injuries, place appropriate interventions in place to prevent further injury, be aware of noteworthy symptoms and report such symptoms to physicians and family members. While these conclusions are troublesome, the Court does not believe that they satisfy either *res ipsa loquitur* exception. There has been no act or omission, such as a foreign object left in a human body after surgery or amputation of the wrong limb, so clearly negligent that it obviates the need for expert testimony. The record is similarly devoid of any admissions from Britthaven or its employees that would provide a sufficient foundation for *res ipsa loquitur.*

Mrs. Halcomb cites *Hazard Nursing Home, Inc. v. Ambrose* for the proposition that "the testimony of an expert in nursing home administration is sufficient evidence to present a trial issue to the jury." (Doc. # 26-1 at 7). Although Mrs. Halcomb does not specifically state that such evidence obviates the need for expert testimony regarding causation, that is certainly the implication. However, the Court believes that *Hazard Nursing Home* is distinguishable from this case by virtue of the expert testimony presented therein. *See* No. 2012-CA-000636-MR, 2013 WL 3808018 at *2-3 (Ky. Ct. App. July 19, 2013). Contrary to Mrs. Halcomb's suggestion, *Hazard Nursing Home* was not submitted to the jury based on the testimony of one expert in nursing home administration. *Id.* Doctors and dieticians also

19

testified that the nursing home breached the standard of care by failing to provide the decedent with adequate nutrition, and that such breach contributed to the continued presence of pressure ulcers. *Id.*

In short, this is not a case where "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care." *Perkins*, 828 S.W.2d at 655. The Court simply does not see how a layman can properly infer that Mr. Halcomb's repeated falls caused cardiac arrest almost ten days later. And what about Mr. Halcomb's dehydration and abnormal lab results? While most laymen generally understand that dehydration can be dangerous, how are they to consider its effect on a patient like Mr. Halcomb, who suffered from several other severe medical conditions? These are precisely the kinds of questions that expert testimony is intended to answer. Because Mrs. Halcomb has no expert to connect Nurse Clevenger's opinions with Mr. Halcomb's death, Britthaven is entitled to summary judgment on the medical negligence claim.

### d.  Loss of Consortium Claim

Kentucky law allows "[e]ither a wife or husband [to] recover damages against a third person for loss of consortium, resulting from a negligent or wrongful act of such third person." Ky. Rev. Stat. Ann. § 411.145(2). Consortium is defined as "the right to the services, assistance, aid, society, companionship and conjugal relationship between husband and wife, or wife and husband." Ky. Rev. Stat. Ann. § 411.145(1). As the language of the statute suggests, loss of consortium claims derive from the injured spouse's claim, and thus cannot survive in its absence. *See Burgett v. Troy-Bilt, LLC*, 970 F. Supp. 2d 676, 685 (E.D. Ky. 2013) (finding that no foundation remained for plaintiff's loss

20

of consortium claim because the Court had already granted summary judgment on her injured husband's underlying claims).

However, Kentucky courts also consider loss of consortium claims to be independent in some sense, as they have their own statute of limitations and compensate for damages separate from the injured spouse's damages. *Norton v. Canadian Am. Tank Lines*, Civ. A. No. 06-411-C, 2009 WL 931137 at *2 (W.D. Ky. Apr. 3, 2009) (surveying Kentucky case law). In short, "[a] claim for loss of consortium can be separate for some purposes, yet also derivative." *Id.* (internal quotations omitted).

Claims for loss of consortium must be brought within one year after accrual of the cause of action. Ky. Rev. Stat. Ann. § 413.140(a) (establishing the one year statute of limitations for personal injury claims); *Floyd v. Gray*, 657 S.W.2d 936, 938 (Ky. 1983) (explicitly applying KRS § 413.140(a) to loss of consortium claims). "A personal injury cause of action accrues when the injury occurs or 'when the plaintiff first discovers the injury or should have reasonably discovered it.'" *Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286, 288 (Ky. App. 1998).

Mrs. Halcomb's Complaint does not explicitly state a claim for loss of consortium. (Doc. # 1-5, p. 1). However, her status as both Plaintiff and Executor-Plaintiff in this action evinces an intent to pursue compensation for her own losses related to Mr. Halcomb's death. (*Id.*). A close reading of the Complaint further suggests that Mrs. Halcomb's loss of consortium claim derives from the wrongful death claim brought on behalf of Mr. Halcomb. (*Id.* at p. 17-18, ¶ 28 *et seq.*). After all, the wrongful death claim is the only count that seeks "compensatory and punitive damages against Defendant, including, but not limited to, . . . . the grief suffered by statutory beneficiaries." (*Id.* at p. 17-18, ¶ 31).

21

As stated above, plaintiffs must assert loss of consortium claims within one year of accrual of the cause of action. It is undisputed that Mr. Halcomb passed away on January 5, 2011. (Docs. # 13-3 at 3; 14-1 at 4). Because this is the date of the injury itself, as well as the date that Mrs. Halcomb discovered the injury, the Court concludes that Mrs. Halcomb's loss of consortium claim accrued on January 5, 2011. Under Kentucky law, Mrs. Halcomb had to assert this claim on or before January 5, 2012. However, she did not file suit until November 28, 2012, more than ten months after the statute of limitations ran. (Doc. # 1-5, p. 1). Thus, Britthaven is entitled to summary judgment on Mrs. Halcomb's loss of consortium claim because it is time-barred by KRS § 413.140.

## IV.    Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     Defendant's Motion for Summary Judgment (Doc. # 25); Defendant's Motion for Summary Judgment on Emogene C. Halcomb's Claim for Loss of Consortium (Doc. # 27); Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Alleging Violations of the Broader Provisions of KRS Chapter 216 (Doc. # 29); Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Alleging Violations of Federal Statutes and Regulations (Doc. # 30); and Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Alleging Criminal Conduct (Doc. # 31) be, and are hereby, **granted in full**;

(2)     Plaintiff's negligence *per se*, medical negligence and loss of consortium claims are hereby **dismissed with prejudice**. Plaintiff's negligence claim (based on Defendant's alleged failure to exercise ordinary care under the circumstances) and claim under KRS § 216.515(26) (alleging specific violations of Kentucky's Residents' Rights Act)

remain intact;.and

     (3)    The parties shall filed a **Joint Notice** of available pre-trial and trial dates **within twenty (20) days of the date of entry of this Order**.

     This 5th day of March, 2015.



Signed By:

David L. Bunning

**United States District Judge**

G:\DATA\Opinions\London\12-255 MOO re Halcomb MSJs.wpd